**SOUTH AUSTIN DRIVE–IN THEATRE et al., Appellants,**

v.

**Michael D. THOMISON, a minor et al., Appellees.**

**No. 11534.**

Court of Civil Appeals of Texas.

Austin.

Nov. 22, 1967.

Rehearing Denied Dec. 13, 1967.

Clark, Thomas, Harris, Denius & Winters, Donald S. Thomas, John Coates, Mary Joe Carroll, Long, Aronson & Coleman, Tom Long, Dean Moorhead, Austin, for appellants.

Paul D. Jones, Byrd, Davis, Eisenberg & Clark, L. Tonnett Byrd, Tom H. Davis, Don L. Davis, Austin, for appellees.

O'QUINN, Justice.

This is a tort action for damages growing out of personal injuries to Michael D. Thomison, a six-year-old boy, whose left leg was severed by the rotary blade of a riding power mower.

Plaintiffs in district court were Michael and his father, Leland C. Thomison. Defendants were Edward W. Joseph, doing business as South Austin Drive-In Theatre; Lester L. Kotrla, an employee of the theatre

who was operator of the mower when the injury occurred; and Gilson Bros. Co., a Wisconsin corporation, manufacturer of the mower. The accident occurred on the theatre grounds during daylight hours early in April, 1965.

The cause went to trial before a jury October 3, 1966. Upon answers to special issues returned October 13, the trial court entered judgment November 10, 1966, for damages in the amount of $117,456.06, against all defendants jointly and severally. Joseph and Gilson Bros. filed motions for rehearing which were overruled January 5, 1967, and they have appealed.

Appellant Joseph seeks an award of full indemnity over against Gilson Bros., which was denied by the trial court, or, in the alternative rendition and remand of the cause.

Appellant Gilson Bros. argues its right to judgment for full indemnity against Joseph which the trial court denied, and ·seeks rendition of judgment in its favor, or, in the alternative, remand of the case.

We affirm the judgment of the district court. We decline to modify the judgment to provide indemnity over against either appellant.

Appellant Joseph does not dispute that there is sufficient evidence to support each of the jury's findings. as to negligence and proximate cause. This appellant's appeal is predicated upon two points. The first point is based upon voir dire examination of the jury panel by counsel for plaintiffs below during which "the matter of liability insurance" was brought up, and the second point is a contention for full indemnity against Gilson Bros.

Appellant Gilson Bros. has assigned nine points of error. Point one is directed at the voir dire examination complained of by Appellant Joseph. Points two through eight pertain to evidentiary or special issues matters. Point nine assigns error in refusal of the trial court to award Gilson Bros. full indemnity over against Joseph.

We will examine and dispose of all assignments under three headings and in the order stated: (1) The voir dire examination of the jury panel, (2) full indemnity over against another appellant, and (3) evidentiary and special issues matters.

Appellant Joseph states his position on the voir dire examination in this manner:

"Judgment against this appellant was entered by the trial court solely upon the basis of the jury's finding that at the time of Mike's injury, Kotrla was acting within the scope of his employment. The finding on that issue was, in all reasonable probability, influenced, to the detriment of this appellant, by the fact that counsel for appellees during the course of his voir dire examination of the jury panel deliberately and emphatically brought the matter of *liability insurance* before the jury." (Emphasis added).

Gilson Bros. contends "it was the victim of *repeated insinuations* by counsel for appellees that Gilson Bros. was *protected by indemnity insurance.*" (Emphasis added).

We are unable to find from the record that counsel for appellees at any time "brought the matter of liability insurance before the jury," as asserted by Joseph. Nor do we find any insinuation by counsel for appellees that Gilson Bros. "was protected by indemnity insurance," as Gilson Bros. avers.

The record presents the entire voir dire examination of the jury panel by counsel for all parties. Counsel for appellees examined the panel row by row, and individually in a number of instances, upon the question, "Has anyone on the first row ever, or any of your relatives or close friends or next door neighbor, for instance, ever been connected with the *insurance industry?*" (Emphasis added).

The entire record of voir dire examination by all counsel consists of 112 pages. Examination by counsel for appellees, together with his statement to the panel, is recorded on 88 pages. That part of the examination pertaining to possible connection "with the insurance industry" consists of eight pages. It appears that the entire examination of the panel by counsel for appellees took approximately two hours, of which 11 or 12 minutes were devoted to the inquiry about possible connections with "the insurance industry."

Throughout this examination no person was asked about connection with any named insurance company. Counsel's inquiry was not directed to any type of insurance, such as casualty, but only to connection with the "insurance industry," in whatever capacity. At no time during this phase of the voir dire examination did counsel or any member of the panel say anything about insurance as protection, or the possibility that insurance was or was not protecting any party to the suit.

Counsel's examination of the panel on this matter is set out in full as follows:

"Q Has anyone on the first row ever, or any of your relatives or close friends or next door neighbor, for instance, ever been connected with the insurance industry? Anyone on the first row?

MRS. HILL: I had a neighbor, who left last week, who was with an insurance company.

MR. BYRD: What was his name?

MRS. HILL: Quirk; he moved to San Antonio.

MR. BYRD: Do you know what kind of business he was in?

MRS. HILL: I don't know, but some kind of insurance. They were a young couple.

MR. BYRD: Thank you, ma'am. Anyone else on the first row? Mr. Bauer?

MR. BAUER: A next door neighbor.

MR. BYRD: Who is that?

MR. BAUER: Charley Henderson; an insurance agency.

MR. BYRD: Does he sell insurance?

MR. BAUER: Yes, sir. I think it is mostly road contractors' bonds.

MR. BYRD: Do you feel your relationship with your neighbor would affect you in this case in any way?

MR. BAUER: No.

MR. BYRD: All right. Is that the only one you know? Now, he is an agent, you say?

MR. BAUER: Yes, sir.

MR. BYRD: He sells various different kinds of insurance? All right. Anyone else on the first row? Anyone on the second row, either you, your relative, a real close friend or a close neighbor that has any connection with the insurance industry. All right, sir. Mr. Rincon?

MR. RINCON: I work with an insurance company.

MR. BYRD: What company is it, sir?

MR. RINCON: National Western Life.

MR. BYRD: Selling life insurance exclusively?

MR. RINCON: No, sir. I do advertising there.

MR. BYRD: I see. Other than that, have you had any connection?

MR. RINCON: No, sir.

MR. BYRD: Anyone other than Mr. Rincon on the second row? On the third row? Mr. Grace.

MR. GRACE: I have a son who is an insurance salesman, with John Hancock.

MR. BYRD: John Hancock—they sell mostly life insurance?

MR. GRACE: Right.

MR. BYRD: And hospitalization? Would that affect you in deciding this case?

MR. GRACE: I don't think so.

MR. BYRD: Anyone else on the third row? Mrs. Christian?

MRS. CHRISTIAN: I have a son-in-law who is a special agent for an insurance company—fire insurance.

MR. BYRD: Do you know what company?

MRS. CHRISTIAN: Gulf.

MR. BYRD: What do his duties entail,—do you know?

MRS. CHRISTIAN: It is fire insurance. I don't really know what he does, but he goes around and sees about how much damage is done on fires.

MR. BYRD: He adjusts the loss after the fire has occurred?

MRS. CHRISTIAN: Yes.

MR. BYRD: I see. To see how much damage the fire cost to pay whatever—

MRS. CHRISTIAN: Yes, sir.

MR. BYRD: All right. Thank you, Mrs. Christian. Someone else raise their hand? Mr. Lyman?

MR. LYMAN: I sell life insurance.

MR. BYRD: You sell life insurance? For what company?

MR. LYMAN: Southern Life.

MR. BYRD: All right. Any other connection other than that?

MR. LYMAN: No.

MR. BYRD: Anyone else on the third row? Anyone on the fourth row? On the fifth row? Mr. Geraghty?

MR. GERAGHTY: I represent Northwestern National Group, National

Automobile Casualty Insurance Company of New York.

MR. BYRD: All right, sir; in what capacity?

MR. GERAGHTY: As a representative, agent; recording agent.

MR. BYRD: All right. How long have you been in that capacity with that company?

MR. GERAGHTY: Oh, for many years. I guess seventeen or eighteen years.

MR. BYRD: Thank you very much, sir.

MR. GERAGHTY: Before that I had my own company.

MR. BYRD: Your own agency, or company?

MR. GERAGHTY: Company.

MR. BYRD: All right, sir; thank you, sir. Anyone else on the back row? Mr. Castillo?

MR. CASTILLO: Jack Puryear is a very close personal friend.

MR. BYRD: Do you work for that agency?

MR. CASTILLO: No, he is just a very close personal friend.

MR. BYRD: That is Mr. Jack Puryear of that agency?

MR. CASTILLO: Yes. I believe that is life insurance. And Mr. Nash, who sells life insurance, is a very close friend.

MR. BYRD: Would either of those gentlemen, either Mr. Puryear or Mr. Nash, is your relationship such that you feel it would influence you in this case?

MR. CASTILLO: No, sir.

MR. BYRD: All right, sir; thank you very much. Anyone else? Mrs. Hill?

MRS. HILL: I am secretary to the Casualty Insurance Commissioner of the State of Texas.

MR. BYRD: Did you ever work for any other company, other than the State?

MRS. HILL: Well, I have worked in an insurance agency.

MR. BYRD: What agency is that?

MRS. HILL: But it has been a long time ago; not here.

MR. BYRD: What agency was that?

MRS. HILL: Well, in Seymour, Texas, for Manley and Jones; and in Odessa for Jim Key.

MR. BYRD: All right. Thank you, Mrs. Hill. Anyone else on the fifth row? Anyone on the back row? Mrs. Warner?

MRS. WARNER: I have an uncle who sells insurance on a part-time basis, but I don't know what company.

MR. BYRD: All right. Is he here here in town? Who is he?

MRS. WARNER: N. C. Gilbert. He is an electrical contractor also.

MR. BYRD: Do you feel, Mrs. Warner, that your uncle would have—his relationship would affect you in any way?

MRS. WARNER: No.

MR. BYRD: Anyone else on the sixth row?

MR. SULLIVAN: My brother-in-law was office manager for Continental Casualty of New York City; he is now claims agent for Pepsi-Cola.

MR. BYRD: Any other connection?

MR. SULLIVAN: No, sir.

MR. BYRD: Thank you, Mr. Sullivan. Mr. Sauls?

MR. SAULS: I know insurance people. I am in the contracting business and I buy compensation insurance.

MR. BYRD: Have you had any— pardon me.

MR. SAULS: I have had once or twice. I didn't get a lawsuit but thought maybe we would.

MR. BYRD: Thank you, Mr. Sauls. Anyone else on the back row other than Mr. Sullivan, Mr. Sauls and Mrs. Warner? Anyone over here?

MRS. PARKER: Yes, I have a nephew by marriage.

MR. BYRD: What does your nephew do?

MRS. PARKER: He is an insurance adjuster, but I couldn't tell you exactly what firm he is with. I really don't know.

MR. BYRD: Have you had any personal relationship, close, in the last few years with your brother-in-law?

MRS. PARKER: My nephew by marriage?

MR. BYRD: Yes; with your nephew.

MRS. PARKER: Yes; he was at my house Sunday.

MR. BYRD: Does he live in Austin?

MRS. PARKER: Yes.

MR. BYRD: Could you tell us his name, please?

MRS. PARKER: Bob Daniels.

MR. BYRD: Do you feel your relationship with Mr. Daniels would affect your judgment in this case, Mrs. Parker?

MRS. PARKER: Not at all.

Mr. BYRD: Thank you very much. Anyone else over here? All right, Thank you. Now, anyone on the first row ever work for any company where it was your duty to handle and adjust claims that were made by other employees, or you have a relative or very close friend who did such a thing—whose job was working for some company was such that you managed, accepted and had something to do with claims that were turned in by employees of that company or any other company? Anyone on the first row?

MALE VOICE: To insurance companies, you mean?

MR. BYRD: Yes. Well, not necessarily insurance companies; a trucking company or a paper mill or mattress company, anything; have you worked for any company, or close friend or relative or member of your family worked for any company, that handles claims of that company. Anyone on the second row? The third row?

MR. GRACE: I report claims, but I don't know whether that comes under the heading of that or not.

MR. BYRD: What type—

MR. GRACE: Well, I have some people working under me, and if they have an accident I report it and see that they get medical attention.

MR. BYRD: All right, sir; we have jumped a little ahead, but you might as well tell me now and you won't have to do it later. What type work do you do, sir?

MR. GRACE: I am the housekeeping supervisor at St. Stephen's Episcopal School, and I also supervise the grounds.

MR. BYRD: I see. So if a claim occurs, you report it.

MR. BYRD: All right. Other than Mr. Grace on the third row, anyone else? On the fourth row? The fifth? The sixth? The back row? Have I missed anyone? Over here?"

Appellees argue that "it was of primary concern to appellees to ascertain whether

any member of the jury panel, his close friends, associates, neighbors or relatives, had any connection whatsoever with the insurance industry."

The contention of appellees is further amplified in this manner:

"Regardless of whether the defendants were or were not protected by liability insurance, a person with such connections might necessarily be prejudiced against plaintiffs in personal injury cases. This information was vitally important if plaintiffs were to intelligently exercise their challenges in an effort to secure a fair trial by an impartial jury. There was no other means by which plaintiffs could obtain this information. To trace each prospective juror's employment history would not suffice."

Appellees assert that the prejudice of a juror could be engendered by the influence of a relative, neighbor, friend or close business associate. "The only way to obtain this information," appellees state, "was to ask a broad, general question in substantially the form used, to wit, whether any" juror, close friends or relatives ever had "any connection with any part of the insurance industry."

It appears that at least nine members of the panel had some connection, either directly, or indirectly through relatives or friends, with the insurance industry. With the information obtained, appellees struck three prospective jurors who indicated insurance connections.

It is the position of appellees that the information obtained was "vitally important to the plaintiffs regardless of whether the defendants were covered with liability insurance or not, since this fact would not be made known to the jury and any prejudice which they might have would work in favor of an insured and a non-insured alike."

◼ We believe that in the absence of a clear inference of the existence of insurance in the case, and where the attention of

the jury panel has not been directed to the area of liability insurance, a good faith inquiry into significant connection, either directly or indirectly through family or close friends or neighbors, with the insurance industry will not of itself constitute a showing of such prejudice as would be reasonably calculated to cause a miscarriage of justice.

◼ Ordinarily it is error for plaintiff to mention in the presence of the jury the fact defendant has insurance, or does not have insurance, against the liability plaintiff is seeking to establish. The reason for this rule is that the matter of insurance, or no insurance, is irrelevant and immaterial, and is calculated to work injury. Myers v. Thomas, 143 Tex. 502, 186 S.W.2d 811 (Tex.Com.App., 1945, opinion adopted by Sup.Ct.), citing Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462, and Rojas v. Vuocolo, 142 Tex. 152, 177 S.W.2d 962.

The case before this Court is unlike the cases in which counsel or a witness has mentioned in the hearing of the jury the presence or the absence of insurance, either by direct assertion or such inference as to leave no doubt that insurance was or was not involved in the case on trial. In this case counsel for appellees confined his inquiry to connection with the industry, without focusing attention on any company by name and without drawing attention in any manner to casualty insurance as distinguished from other forms of insurance. There is a complete absence of connection of a liability insurance company with defendants or with the defense of this suit.

Appellants place their reliance on the rule of Green v. Ligon, 190 S.W.2d 742 (Tex. Civ.App., Fort Worth, writ ref. n. r. e.). That case involved injury to a five-year-old child struck by a motor vehicle in which counsel for plaintiff on voir dire asked the jury panel whether any member was employed or had any financial connection with the Commercial Standard Insurance Company. Later, during their deliberations, the jurors talked among themselves about the

probability defendant was insured. The evidence was conflicting, and the margin for plaintiff's recovery was very narrow. There was evidence that the question asked by plaintiff's counsel about the specific insurance company led some of the jurors to believe the defendant was protected by a policy of insurance. 190 S.W.2d 742, 748, col. 2.

In Dennis v. Hulse, 362 S.W.2d 308 (Tex.1962), the Supreme Court observed that

"If anything is said from which the jury might reasonably infer that the defendant is insured, the court may either order a mistrial ·or instruct the jury not to consider the improper statement and then await the verdict before determining whether to grant a new trial."

The record discloses in this case that while counsel for appellees was conducting his voir dire examination counsel for Gilson Bros. approached the bench and asked the trial judge to note that defendant was moving for a mistrial based on the questions being asked. The court indicated he would note that counsel had advised he would move for mistrial. Counsel for appellees was unaware, at the time, of this exchange between opposing counsel and the court. No objection was made to the questions. At conclusion of voir dire examination by all counsel, appellants moved for a mistrial. Appellants did not later request instructions from the court to the jury in regard to the questions.

The court did instruct the jury, as required by Rule 226a, Texas Rules of Civil Procedure, and gave a copy to each juror, immediately after the jurors were sworn in. Paragraph 9 of these instructions reads:

"9. Do not consider, discuss, nor speculate whether or not any party is or is not protected in whole or in part by insurance of any kind unless evidence about insurance is admitted."

The Supreme Court held in Dennis v. Hulse, supra, that the appellate court is not authorized "to reverse merely because the record discloses some error that is reasonably calculated to cause a miscarriage of justice."

"The party appealing," the Court declared, "must also show that it probably did cause the rendition of an improper judgment in the case." (362 S.W.2d 308, 309, col. 2, citing Rules 434 and 503, Texas Rules of Civil Procedure).

Neither Joseph nor Gilson Bros. complains that the jury's award of damages was excessive. There is nothing in the record to indicate, nor is there any claim, that the jurors discussed or considered the probability that anyone of the defendants was insured.

Joseph seeks to show injury under the proposition that because the jury found Kotrla was acting within the scope of his employment, the jury was in all reasonable probability influenced by the voir dire examination regarding possible connections with the insurance industry.

Kotrla went to work at the drive-in theatre for Joseph after answering an advertisement for a person with a trailer mobile home who had an income and could work for a small salary. Kotrla was required to live on the premises. He was paid $25 per week and was furnished utilities. Kotrla owned the power mower, and Joseph paid for gasoline and repairs.

Instructions as to work Kotrla was to perform usually came from Ken Kuhr, night manager of the theatre, or from Roger Joseph, son of the theatre owner. Roger Joseph would give specific instructions through notes he sent by Kuhr.

When asked at the trial to state "what Mr. Kuhr and Mr. Roger Joseph instructed you that your duties were," Kotrla's testimony was as follows:

"A  Well, the fence to be mended, if they needed mending, and the speak-

er posts knocked over—in other words, it happened during the night when I was off, they leave notes for me to mend them; and to cut the grass, the shrubs, and the cane, all such as that.

Q Was it part of the requirements of your job to pick up the litter off the theatre premises?

A Yes, sir; the litter pickup, and to clean out the snack bar, and scrub the bathrooms, mop the floors; general clean-up.

Q. Was it part of your job, also, during the day to be there when vendors came in to restock the machines?

A Yes, sir, such as the iceman, the Coke man, the linen man, and the cigarette man; they came out to the snack bar and stocked the machines.

Q All right, sir. Were you instructed to cut the grass and to maintain the property generally on the entire theatre properties,—that is, everything from the ditch behind the back screen clear to the front, to South Austin, I guess you would call it,—South Congress Street, I mean?

A From South Congress, Ben White down to Radam Lane. It was a square block, just a whole square block in that area.

Q All right, sir. Now, were you instructed by either Mr. Roger Joseph or Mr. Kuhr to keep children off the fences and the equipment, and to keep them away, keep them from stealing speakers and anything else that might be stolen?

A Yes, sir.

Q All right, sir. Did Mr. Kuhr when you first went out on that first occasion, take you around on the premises and show you where you were supposed to cut grass and pick up litter and clean up and maintain in general?

A Yes, sir.

Q Now, there is a big ditch, the photographs will show, which is behind—well, it starts sort of behind the main screen and runs—I am not sure I am correct, but I believe either all the way or most of the way north and south toward Ben White Boulevard in general; did I make a correct statement?

A Yes, sir. It goes to Ben White Boulevard and Radam Lane.

Q All right, sir. Did you have any equipment or was any equipment furnished to you that you could get down in that ditch and cut that grass?

A No, sir, for the simple reason there is sewage drainage going down through there.

Q Oh; the sewage drains into the ditch?

A Yes, sir.

Q So I take it you had no equipment or none was provided to get down in the ditch and cut the grass there?

A No, sir.

Q Other than in that ditch, which you told us the sewer drains in, and is rough, did you maintain the grass on the entire remainder of the theatre premises?

A Yes, sir.

Q And were you instructed specifically to do that?

A Yes, sir.

MR. COATES: Your Honor, I would like to know who he is talking about instructed him.

Q All right. Would you tell us, please, sir?

MR. COATES: And when.

A I was instructed by Roger Joseph and Mr. Kuhr to cut the grass on the entire area of the South Austin Drive-In Theatre."

We fail to find any testimony in the record, from any witness, refuting or modifying Kotrla's testimony that he was charged with the duty of mowing the entire area of the drive-in theatre.

Kotrla was cutting grass in the area of the theatre property where his house trailer was parked when the accident occurred that injured young Michael Thomison. Kotrla brought the mower to a halt, then backed it up, preparatory to returning in the direction from which he had just mowed a strip. Kotrla was not looking behind as he backed the mower, and struck the boy with the rear of the machine. It was about 4:30 o'clock on the afternoon of April 2, 1965.

Joseph argues that Kotrla was mowing the area for his own benefit because he was in that portion of the theatre grounds in which his mobile home was parked. Joseph also argues that Kotrla, who had worked since about 7 o'clock that morning, with time out for lunch and at least one rest period in the afternoon, had "put in at least a normal day's work," and "had already mowed the public area of the theatre property." Kotrla testified that he usually quit work about 4 or 5 o'clock in the afternoon, more often by 4 o'clock. It appears that he was instructed to get his work finished before the night crew came on, which at that time of year would be about 5:30 o'clock.

The evidence shows that Kotrla and Mike had been together a good part of the day while Kotrla mowed the theatre grounds. Kotrla had allowed Mike to ride with him on the mower some of the time. Mike was spending the week-end with Mrs. Kotrla, who is Mike's grandmother, and Mr. Kotrla, who had in recent years married Mike's grandmother. Sometime in the middle of the afternoon Kotrla and Mike had gone into the trailer home for Kotrla to rest about 15 to 20 minutes while smoking a cigarette and getting a drink of water. Mrs. Kotrla made a sandwich for Mike.

After resting, Kotrla went out to resume mowing. He knew Mike followed because he heard Mrs. Kotrla call to the boy about finishing his sandwich and heard the boy answer from outside the trailer saying he would finish the sandwich later. Kotrla mowed from the trailer without going to the end of the flat area, and, as already pointed out, was backing up to turn and mow back toward the trailer when he hit Mike and caught his leg under the mower.

Kotrla testified that it had been his purpose to mow some fifty feet further to a fence, but that because it was getting late in the day he decided to make shorter runs and finish the mowing next day.

We cannot agree with Joseph that the area where Kotrla was mowing and the manner in which he was mowing "indicated that he was taking care of his own yard."

With the testimony before it, we believe the jury had adequate support for its finding that Kotrla was acting within the scope of his employment at the time he hit Mike with the mower. We conclude that there is not sufficient showing of harm to Joseph reasonably resulting from matters complained of in the voir dire examination of the jury panel by counsel for appellees. Joseph has not shown that the voir dire examination probably caused rendition of an improper judgment.

We overrule Appellant Joseph's first point of error that the trial court should have sustained his motion for mistrial based on the voir dire examination.

■ Gilson Bros. Co. argues that the voir dire examination caused the rendition

of an improper judgment because the jury found that this appellant was negligent in three respects, two of which findings were set aside by the trial court. "The very fact that the jury saw fit," Gilson Bros. contends, "to hold against this appellant upon two grounds that the trial court held were without support in the evidence, and upon a third ground that is equally flimsy, is strong proof that the jury was swayed by something other than the evidence."

In addition, Gilson Bros. points out that this appellant was the only corporate defendant, with its charter from another state, and was "the victim of repeated insinuations by counsel for appellees that it was protected by indemnity insurance." As we have already indicated, we are not in agreement with Gilson Bros. that the voir dire examination regarding possible connections with the insurance industry, which we have quoted in full, amounted to "repeated insinuations" that Gilson Bros. "was protected by indemnity insurance."

The evidence is undisputed that when Kotrla found he had hit Mike, the boy was lying down at the rear of the mower, with his left leg pinned down by the sprocket and drive chain located on the rear axle of the mower. Kotrla was unable to extricate the youngster by pulling him away from the mower. Kotrla lifted the mower off Mike by tilting one side and turning it over. It was then he found that Mike's left leg, pinned under the sprocket, had been severed by the rotary blade.

The jury found, in answers to special issues, that (1) the rear gear sprocket was "too large in diameter," (2) the rear gear sprocket of the drive assembly was located "too far from one of the rear wheels," and (3) Gilson Bros. failed "to adequately guard the drive chain and gear sprocket located on the rear axle of the mower."

The trial court, upon motion made after the verdict, set aside the two findings that the sprocket was too large and the sprocket was too far from one of the rear wheels. The trial court refused to set aside the finding that Gilson Bros., as manufacturer of the power mower, had failed to guard adequately the drive chain and gear sprocket.

Evidence adduced at the trial having to to do with design and operation of the power mower was extensive and detailed. The testimony of three expert witnesses heard by the jury comprises nearly 345 pages of the statement of facts. Numerous photographs were introduced, motion pictures of the mower in operation were shown the jury, and the Kotrla power mower and at least two other machines were exhibited to the jury.

The trial court apparently concluded, upon reflection after the verdict, that there was no evidence or insufficient evidence to sustain findings that the sprocket was too large and was located too far from one of the rear wheels. It is clear, however, that the trial court was of the opinion that the evidence was ample to sustain the jury finding that Gilson Bros. had failed to guard adequately the drive chain and gear sprocket located on the rear axle.

It was the drive chain and gear sprocket assembly on the rear axle that Kotrla found pinning Mike's leg to the ground after the accident. An expert witness for appellees testified that the sprocket and chain as the mower was backed "would act as a trapping action, just like on a caterpillar tractor, pinning the object to the ground and rolling over and over it, preventing the fellow from pulling his leg out as the mower continued to come backward onto his leg or whatever else it would roll over." The witness further testified that the rear axle or the vertical seat support, at points other than at the revolving sprocket, would cause a leg "to be doubled up, not pinning it to the ground, and thereby permitting it, hopefully, not to go underneath the mower any further than perhaps just the toes pushing under it."

There was evidence that a protective bar or shield could be installed on the type of mower Kotrla was using, behind the sprocket and chain assembly, to form a guard or bumper, at a cost to the manufacturer of $1.75 to $3.00 per unit.

An expert witness called by Gilson Bros. testified that the exposed gear sprocket assembly on the rear axle "would climb a leg" while the mower was in reverse, and that once the sprocket and chain pinned a leg to the ground, the machine had to travel only about five or six inches before the leg would reach the whirling blade itself. This witness testified that a properly designed guard for the chain and gear sprocket, at the rear of the mower, would reduce the chances of injuring small children and probably would operate to push a child's leg back and away from the drive chain and from the rotating blade.

It was upon this testimony, coming from expert witnesses offered by appellees and by Gilson Bros., that the jury evidently concluded that Gilson Bros. failed to guard adequately the drive chain and gear sprocket. In addition, the jury had heard Kotrla's unchallenged description of how Mike's leg was found pinned down by the chain and sprocket, and severed by the whirling blade, of a mower not equipped with any character of foil or guard behind the chain and sprocket assembly. It was further before the jury that the mower used by Kotrla was designed to cut grass while moving foward or backward and was equipped with a reverse gear.

The evidence was such that we believe the jury had adequate support for its finding that Gilson Bros. failed to guard adequately the drive chain and rear sprocket. There is not a sufficient showing of harm to Gilson Bros. reasonably resulting from the voir dire examination of the jury panel. Gilson Bros. has not shown that the voir dire examination probably caused rendition of an improper judgment.

We overrule the first point of error presented by Gilson Bros. based on the trial court's refusal to grant a mistrial because of the voir dire examination of the jury panel.

Both Joseph and Gilson Bros. moved for judgment against each other for full indemnity. The trial court denied both motions in the final judgment. The trial court allowed Joseph recovery from Kotrla in the full amount of all sums Joseph became liable for under the judgment.

The jury found, as already observed, that Kotrla was acting within the scope of his employment with Joseph when he was mowing the grass in the area where Mike Thomison was injured. The jury also found that Kotrla failed to keep a proper lookout and that this failure was a proximate cause of the collision between the power mower and Mike Thomison. The jury further found that the act of Kotrla in backing the mower as he did was not the sole proximate cause of the loss of Mike Thomison's left leg.

In addition to other findings already discussed, that Gilson Bros. failed to guard adequately the drive chain and gear sprocket on the rear axle of the power mower and that this was a proximate cause of the loss of Mike Thomison's left leg, the jury found that the accident was not unavoidable. The jury by its findings absolved Mike of contributory negligence.

■ The test by which one tortfeasor establishes his right to indemnity against another tortfeasor, where both have been found negligent in their respective duty to the injured party, has been applied by the Supreme Court of Texas in at least two cases.

In 1963 the Supreme Court, in refusing to allow indemnity in a case before it, declared that:

"The test laid down in Austin Road Co. v. Pope, 147 Tex. 430, 216 S.W.2d 563, is that for one tort-feasor to be al-

lowed recovery of indemnity against another it must be predicated upon a consideration as to whether the tortfeasor as plaintiff suing the other in tort would be entitled to recover." Gulf, Colorado and Santa Fe Railway Co. v. Bliss, 368 S.W.2d 594 (Tex.1963), 596, col. 2.

The rule was similarly stated by Professor Gus M. Hodges in 1947, although at the time he declared that the "suggested rule" was not "one fashioned wholly" by him and not one that had "never occurred to the courts." "Contribution and Indemnity among Tortfeasors," Hodges, 26 Tex.L.R. 150, 162.

Among cases examined in this article were Wheeler v. Glazer, 137 Tex. 341, 153 S.W.2d 449, 140 A.L.R. 1301; Otis Elevator Co v. Cameron, 205 S.W. 852 (Tex.Civ.App., Dallas, writ ref.), Dallas Ry. and Terminal Co. v. Harmon, 200 S.W.2d 854 (Tex.Civ.App., Dallas, writ ref.), and Texas Power and Light Co. v. Stone, 84 S.W.2d 738 (Tex.Civ.App., Eastland, writ ref.).

Development of the law pertaining to the rights and duties of tortfeasors among themselves has been attended with striking want of complete accord except in results. The earlier theory of indemnity, based on "active versus passive negligence" of the tortfeasors, was replaced by the rule applied by the Supreme Court in Humble Oil and Refining Co. v. Martin, 148 Tex. 175, 222 S.W.2d 995, where the right to indemnity turned upon the issue of whether one defendant breached a duty of care owed by that tortfeasor to another, in addition to or coexistent with the primary duty owed the injured party.

In the Humble case, with one justice not sitting, three justices dissented in part and concurred in part. The case was critically examined in 29 Texas Law Review, in which it was urged that the "best view * * * would regard it as a question of whether one defendant is guilty of active negligence, and the other only of passive negligence." 29 Tex.L.R. 106, 107.

The Supreme Court in Strakos v. Gehring, 360 S.W.2d 787 (Tex.1962), followed the rule of Austin Road Co. v. Pope, supra, with one justice concurring in the result and two justices dissenting.

In Strakos v. Gehring, supra, the Court after reviewing earlier authorities observed that:

"These cases illustrate three approaches used to establish a common-law right of indemnity. One involves the concept of 'different qualities' of negligence; another involves a breach of duty as between tortfeasors; the third gives indemnity to the tortfeasor who is only vicariously liable by operation of law." 360 S.W.2d 787, 798, col. 1.

The Court concluded that the facts of Strakos v. Gehring were "not susceptible to any of these approaches" and that neither tortfeasor was entitled to indemnity. The basis for the Court's decision was expressed in language quoted from Austin Road Co. v. Pope, supra, in which it was pointed out that either of the tortfeasors might have prevented the wrong, but did not, and both violated a duty of due care owed the injured party. "Consequently," the Court said in the Austin Road Co. case, "each was guilty of the same quality of negligence toward the injured" person. "This language," the Court declared in the Strakos case, "has application to the case at hand." 360 S.W.2d 787, 798, col. 2.

We believe the rules laid down by the Supreme Court in the cases discussed are controlling of the facts of this cause. In the present case, from the findings of the jury as related and from the facts we have stated, it seems clear that neither Joseph nor Gilson Bros. is entitled to full indemnity. There are no facts or findings establishing varying degrees of negligence. The negligent conduct of each was a proximate cause related to Mike Thomison's loss of his left leg. No single act of either was

found to be the sole proximate cause. Parker v. Leach, 274 S.W.2d 721 (Tex. Civ.App., Beaumont, writ ref. n.r.e.).

Joseph insists that Gilson Bros. owed Joseph the same duty owed the general public to guard adequately the chain and sprocket on the rear axle of the power mower and therefore Joseph is entitled to indemnity. We believe this duty does not meet the test of Austin Road Co. v. Pope, supra. We fail to see in this record a breach by Gilson Bros. of any duty owing by it to Joseph except the general duty owed Mike Thomison and all others lawfully in vicinity of the power mower while it was being operated. It appears to us that both Joseph and Gilson Bros. owed a duty to exercise a care, one in the operation and the other in the design, of the power mower for the safety of Mike Thomison and all others in the vicinity of the machine while it was being used as it was designed and intended to be used. Both Joseph and Gilson Bros. breached their duty, and each was guilty of the same quality of negligence toward Mike. Petco Corporation v. Plummer, 392 S.W.2d 163 (Tex.Civ.App., Dallas, writ ref. n.r.e.), Union Iron and Metal Co. v. Gibson, 374 S.W.2d 458 (Tex.Civ.App., Texarkana, writ ref. n.r.e.)

The quality of Joseph's negligence, acting through Kotrla, his employee, is obvious. It was negligent not to use due care, through proper lookout, in operating the power mower, knowing that another person, in this instance, a small child, was present and possibly in immediate vicinity of the machine. When Kotrla brought the mower to a halt and, without looking backward, reversed the machine, the mower collided with Mike. Thus was established Joseph's negligence.

The quality of Gilson Bros.' negligence is found in the design of its machine. There was ample evidence that the machine was manufactured and sold by Gilson Bros. for use by families and in recreation areas and public parks. Expert witnesses, testi-

fying for appellees and for Gilson Bros. were in agreement that a guard, shroud, shield, bar, "cowcatcher," or bumper affixed to the machine at the rear would tend to push a leg away from the sprocket and chain mounted on the rear axle. With the sprocket and drive chain exposed, and in no manner shielded by a guard or bumper, a leg encountered by this drive assembly, when the machine was in reverse, would pin the leg to the ground. Within the next five or six inches the leg would encounter the rotary blade. This afforded the operator of the mower limited time in which to halt the mower after becoming aware that the machine had collided with a child, such as Mike Thomison, before a leg would encounter the whirling blade, resulting in substantial bodily harm. Thus was established the negligence of Gilson Bros.

When Gilson Bros. designed and manufactured a machine and sent it out to be used in the manner and for the purpose for which it was made, without adequately guarding against unreasonable risk of causing substantial bodily harm while operated lawfully and as intended, there was a failure to exercise reasonable care. Johnson v. Murray Co., 90 S.W.2d 920 (Tex.Civ. App., Austin, writ dsmd.); Roosth and Genecov Production Co., 152 Tex. 619, 262 S.W.2d 99; International Derrick and Equipment Co. v. Croix, 241 F.2d 216 (C. C.A., 5th Cir., 1957, cert. den., 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1428).

This case does not involve the question of indemnity as between Joseph and Kotrla. The trial court, as we have noted, allowed full indemnity for Joseph against Kotrla. This action has not been challenged on appeal, and it was in accord with the rule that while the master is liable to the injured party for the servant's negligence, the employer, when his liability is only constructive, is entitled to recover from the employee the full amount of damages for which the employer may be liable. Eastern States Petroleum Co. v. Texas and N.O.R. Co., 114 S.W.2d 408 (Tex.Civ.App., East-

land, writ dsmd.); Kampmann v. Rothwell, 101 Tex. 535, 109 S.W. 1089; 18 Am.Jur.2d, Contribution, sec. 39, p. 57.

We believe that the negligence of Joseph, although constructive, but one upon which the injured party may recover, places Joseph in *pari delicto* with Gilson Bros. Since Joseph and Gilson Bros. were concurrent or joint tortfeasors, having no relation to one another, each of them owing the same duty to Mike Thomison, and involved in an accident in which the injury occurred without breach of duty to each other, no right of indemnity exists on behalf of either against the other.

We overrule the points of error assigned by these appellants under which they assert the right of indemnity against each other.

Appellant Gilson Bros. contends under its points two and three that there was no evidence and insufficient evidence to support the jury's finding that Gilson Bros. "failed to adequately guard the drive chain and gear sprocket located on the rear axle of the power mower." Under point four, briefed with two and three, Gilson Bros. argues that as a matter of law it had no duty to guard the drive chain and gear sprocket.

In addition to the testimony of the experts, which we have examined earlier, with respect to the protective action of a guard or bumper if one had been installed, there was evidence that "all moving chains, belts and gears" on power lawn mowers should "be enclosed or adequately guarded to prevent personal injury."

An expert witness testifying for Gilson Bros. stated that from 1956 through 1960 he served as chairman of a committee named by the Lawn Mower Institute to write specifications for the American Standards Association for the design of lawn mowers. It was shown that in the United States 65,000 to 80,000 persons annually are injured by power mowers. The specifications prepared by the committee, published as the American Standard Safety Specifications for Power Lawn Mowers, were introduced in evidence. Section 2.2.11 of these safety requirements provides that "all moving chains, belts and gears *shall be enclosed or adequately guarded* to prevent personal injury." (Emphasis added).

It was the testimony of an expert witness for appellees that a basic engineering principle in the field of mechanical design is that all moving chains, gears, sprockets, and belts must be enclosed or guarded to prevent personal injury to persons who would otherwise come into contact with these moving parts. The witness concluded that the "design as to the drive chain assembly" on the "Wizard Holiday 25," the machine made by Gilson Bros. and being operated by Kotrla when Mike Thomison was injured, did not meet the minimum safety engineering standards of the witness' profession, and that the exposed chain assembly was "a dangerous design."

The assertion of Gilson Bros. that it owed no duty to design a power mower that "could not back over a child and injure him" does not meet the issue of duty. We believe it is a correct statement of the law to say that Gilson Bros. owed a duty to use reasonable care in the design and manufacture of its power mower to prevent injury to the user and to persons Gilson Bros. should reasonably expect to be in the vicinity of the mower's probable use.

The rule prevailing in this State was expressed in the following language from Texas Bitulithic Co. v. Caterpillar Tractor Co., 357 S.W.2d 406 (Tex.Civ.App., Dallas, writ ref. n.r.e.):

"We believe that a correct statement of the present rule pertaining to a manufacturer's liability is to be found in 'Restatement of the Law of Torts' § 395, p. 1073, and § 398, p. 1084. We quote § 398:

'A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to lia-

bility to others whom he should expect to use the chattel lawfully or to be in the vicinity of its probable use for bodily harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design.' " 357 S.W.2d 406, 409, col. 2.

It appears to be the argument of Gilson Bros. that on the theory persons are rarely injured by a mower being operated in reverse the injury to Mike Thomison was not reasonably foreseeable. The only evidence before the jury with respect to rarity of such accidents was that out of some 200 accidents analyzed by the committee for the Lawn Mower Institute, only three were the result of lawn mowers operated in reverse. We think that negligence simply means creating a risk that a reasonably prudent person would avoid and is not related to a statistical table of frequency of harm. This latter element is relevant only to the issue of foreseeability by the manufacturer of injury to persons within the vicinity of the machine in use.

The rule was stated by the Supreme Court in Motsenbocker v. Wyatt, 369 S.W.2d 319 (Tex. 1963) in this language:

"For a result to be legally foreseeable * * * it is not 'required that the particular accident complained of should have been foreseen. All that is required is "that the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen." ' Carey v. Pure Distributing Corp., 133 Tex. 31, 124 S.W. 2d 847." 369 S.W.2d 319, 323, cols. 1–2.

The argument of Gilson Bros. on foreseeability, based on only three reported instances of injuries when a mower was in reverse, is contrary to the rule found in Parking, Inc. v. Dalrymple, 375 S.W.2d 758, (Tex.Civ.App., San Antonio, no writ),

in which the court citing Carey v. Pure Distributing Corp., supra, held against the contention that the owner of a parking lot owed no duty to erect a barrier along the boundary of his lot to keep customers from falling into an adjacent creek because no one had been so injured before and he had no reason to anticipate such an occurrence.

In deciding the point, the court employed the following language:

"Appellant showed that for the fourteen years it had operated the lot no one had ever fallen into the creek or had attempted to take a short-cut to the theatre. * * * We cannot say, as a matter of law, that appellant could not reasonably anticipate that someone would fall into the creek if it was obscured, and suffer some type of injury. * * * We overrule appellant's point that the accident was not foreseeable as a matter of law." 375 S.W.2d 758, 763, cols. 1–2.

It was contended in Carpini v. Pittsburgh and Weirton Bus Co., 216 F.2d 404 (C.C.A., 3rd Cir., 1954) that defendant owed no duty to design petcocks, used to drain air brake chambers, in a different location because never before had petcocks been sheared off and caused a collision.

In overruling this contention the Court observed:

"General Motors cited the experience over the years with this type of design, tending to show that despite the millions of miles vehicles of this sort have traveled on highways no bus accident of the type here involved has been reported. Of course, that was relevant testimony. * * But, of course, it was not conclusive any more than evidence of general practice in an industry is conclusive on whether operations are conducted with due care." 216 F.2d 404, 407.

The argument of Gilson Bros. based on rarity of occurrence is akin to its further argument that Gilson breached no duty in failing to guard the chain and gear sprocket

from the rear because it is not the practice of the industry to provide such guards.

The record shows that of the several riding type power mowers in photographs introduced in evidence, three mowers were designed and equipped with rear guards that would tend to deflect objects from the rear sprocket assembly. At least one model before the jury had a rear guard. The expert witness for Gilson Bros. testified that some manufacturers do equip mowers with rear guards or bumpers. It would appear that if there is a custom in the industry not to provide rear guards, as Gilson avers, the custom is by no means uniform.

But uniformity of custom in the industry, even if it existed, would not be controlling. The rule in Texas is that a showing may be made that the custom itself is a negligent custom. Kuemmel v. Vradenburg, 239 S.W.2d 869 (Tex.Civ.App., San Antonio, writ ref.n.r.e.). General custom or practice in an industry is admissible in evidence to aid the jury in determining the issue of negligence, but custom is not an absolute test of negligence. The custom itself may be negligent. Texaco, Inc. v. Joffrion, 363 S.W.2d 827 (Tex.Civ.App., Texarkana, writ ref.n.r.e.).

The additional contention by Gilson Bros., that it should be relieved of liability for the consequences of its failure to guard the sprocket and chain because the mower was being misused at the time Mike Thomison was injured, is without adequate support.

The evidence shows that Kotrla was mowing grass when the accident occurred. It shows that Kotrla had the mower in reverse and was backing up to mow in the direction from which he had just driven the mower. The mower was designed and manufactured to permit precisely these movements, forward and backward, and we are unable to see how misuse of the machine under these facts could exist.

The fact Kotrla was negligent in backing up without looking cannot serve to relieve Gilson Bros. of liability for the consequences of its own negligence in not providing an adequate guard for the chain and rear sprocket at the rear of the machine. It is not necessary for the negligence of Kotrla to be foreseeable in order to hold Gilson Bros. liable for their negligence. McAfee v. Travis Gas Corporation, 137 Tex. 314, 153 S.W.2d 442.

In the McAfee case the Supreme Court said:

"We think it is the generally accepted rule as applied to torts that 'If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability.' Restatement of the Law of Torts, Vol. 2, p. 1184, sec. 439. Stated in another way, 'The intervention of an unforeseen and unexpected cause is not sufficient to relieve a wrongdoer from consequences of negligence, if such negligence directly and proximately co-operates with the independent cause in the resulting injury.'" 153 S.W.2d 442, 447–448, cols. 2, 1.

We believe that under the facts of this case the power mower was not being put to abnormal or unintended use at the time Mike Thomison was injured. We think that there was some probability of harm from an unguarded drive chain and gear sprocket located on the rear axle of the mower which was sufficiently serious that ordinary men would take precautions to avoid such probable harm.

To establish the negligence of Gilson Bros. in failing to take the precaution to guard the moving chain and sprocket, it was not necessary to show that Gilson Bros. should have foreseen the precise injury sustained. Swearngin v. Sears, Roebuck and

Co., 376 F.2d 637 (C.C.A., 10th Cir., 1967); International Derrick and Equipment Co. v. Croix, supra.

We conclude that the findings of the jury that Gilson Bros. failed to guard adequately the drive chain and gear sprocket located on the rear axle of the power mower are sufficiently supported by the evidence. We overrule points two, three and four asserted by Gilson Bros.

Points five and six of Gilson Bros. which are briefed together, challenge the jury's finding that failure to provide adequate guard for the moving parts on the rear axle of the machine was a proximate cause of injury to Mike Thomison.

Kotrla testified that the sprocket and chain were resting on Mike's leg when the mower came to a halt and he could not pull Mike from under the machine by lifting his body with hands under his armpits. Mike was freed only after Kotrla overturned the machine.

One expert witness testified that the machine, in pinning Mike's leg to the ground as it did, exerted a force of about 200 pounds, trapping Mike's leg and preventing him from pulling away as the sprocket and chain rolled over and over in the manner of a caterpillar tractor. It was his testimony the probability of injury to the extent of losing a leg "would have been greatly reduced had the sprocket been adequately guarded."

An expert witness for Gilson Bros. testified that the unguarded gear sprocket on the Gilson machine would "climb a leg," and that a properly designed rear guard probably would offer the same type of protection from the gear sprocket that the blade housing affords from the rotating blade. This witness testified that a properly designed rear guard would reduce chances of injuring small children. It also was his testimony that a rear guard probably would operate to push a child's leg back and so delay, if not prevent, the leg from being pinned down by the sprocket.

Gilson Bros. argue that the blade cut off Mike's leg, not the unguarded drive chain sprocket, and that Kotrla's negligence was a new and independent cause of the injury. We cannot agree with these contentions.

It is undisputed in this case that the unguarded rear sprocket pinned Mike Thomison's leg to the ground as the machine was running backward and held it while the blade severed the leg between the ankle and knee. Kotrla testified that the motor stalled and went dead "a split second" after Kotrla felt the impact with Mike. The machine traveled "one to two feet" after the impact. It was shown at the trial that an object transfixed by the rear sprocket would be fed into the blade in another six inches.

The applicable rule was stated in Chancey v. Van Luit, 306 S.W.2d 377 (Tex.Civ.App., Amarillo, writ ref. n. r. e.), in this language:

"Negligence, to render a person liable, need not be the sole cause of an injury. Where several causes combine to produce an injury, a defendant is not relieved from liability because he is responsible for only one of them. It is sufficient if his negligence is an efficient cause without which the injury would not have resulted. Where several causes producing injury are concurrent and each is an efficient cause without which the injury would not have happened, then injury may be attributed to all or any of the causes." 306 S.W.2d 377, 380, col. 1, 2.

We find that the same argument made here by Gilson Bros. on new and independent cause was considered and overruled in Walker v. Burgdorf, 150 Tex. 603, 244 S.W.2d 506. There the Supreme Court cited Gulf, C. & S. F. Ry. Co. v. Ballew, 66 S.W.2d 659 (Tex.Comm.App.1933), and quoted from the earlier decision as follows:

"When the new cause or agency concurs with the continuing and co-operating original negligence in working the injury, the original negligence remains a proximate cause of the injury, and the fact that

the new concurring cause or agency may not in such case have been reasonably foreseeable should not relieve the wrongdoer of liability." 244 S.W.2d 506, 510, col. 1; 66 S.W.2d 659, 661, col. 1.

The theory of Gilson Bros. appears to be that its negligence was too remote to be a proximate cause, and that the act of Kotrla in backing the mower over the little boy was "sufficient to stand as the cause of the misfortune." The jury found that Kotrla's negligence was not the sole proximate cause of the loss of Michael Thomison's left leg. Gilson Bros. has not brought forward points of error attacking this finding. The point is waived. Elliff v. Texon Drilling Co., 146 Tex. 575, 210 S.W. 2d 558, 4 A.L.R.2d 191. The claim by Gilson Bros. that its negligence was too remote necessarily embraces the contention that its negligence was not continuing. We think it is clear that Gilson's negligence was the continuing and cooperating original negligence in working the injury.

We overruled points of error five and six asserted by Gilson Bros.

■ Under its seventh point of error Gilson Bros. contends that the special issue submitted to the jury inquiring about failure "adequately" to guard the drive chain and gear sprocket, together with definition of the term "adequately guard," was global in form and did not properly separate several particular acts or omissions claimed to constitute "inadequate" guarding.

The issue complained of was submitted as follows:

"Do you find from a preponderance of the evidence that Gilson Bros. Co. failed to adequately guard the drive chain and gear sprocket located on the rear axle of the power mower?"

The definition the trial court submitted was as follows:

"By the term 'adequately guard,' as that term is used herein, is meant such guarding as would have been done by an ordinarily prudent person in the exercise of ordinary care, acting under the same or similar circumstances."

Appellees as plaintiffs below pleaded that the injuries sustained occurred when "Mike's left leg was then caught between the drive chain of the mower and the ground and his leg remained pinned in that position until the blades of the mower came in contact with his leg." Appellees also pleaded that the injuries were caused by the negligence of Gilson Bros. in that "the drive chain was inadequately guarded."

In the trial of the case only one type of guard for the drive chain and gear sprocket was suggested or advocated by the expert witness for appellees. That type of guard appeared in three exhibits introduced by appellees. It also was the type of guard affixed to a mower that Gilson Bros. introduced as an exhibit, and the same type of guard shown in a photograph of a mower introduced by Gilson Bros.

The guard uniformly exhibited to the jury as being "adequate" under the testimony of the witnesses was a simple rear bumper or blade-type shroud constructed similar in design to a "cowcatcher." The testimony of an expert witness was that "this guard is shaped much the same as a cowcatcher on an old-fashioned train, such that it if it engaged any object, it would tend either to push it backward or to deflect it to one side." There was further testimony that the guards shown in two of the exhibits were "economical and practical guarding designs against objects coming into contact with the sprocket while the mower is in a backward mode."

The terms "adequate guard" and "adequate back guard" were used frequently in the course of examination of the expert witnesses. Much of the testimony elicited from expert witnesses offered by appellees and by Gilson Bros. was developed with specific reference to the guard device shown in the photographs and other exhibits before the jury. The specific criticism of the Wizard Holiday 25, manu-

factured by Gilson Bros. and operated by Kotrla, was that "there is no direct guard which will prevent an object located immediately behind the sprocket, or perhaps below the sprocket, from contacting the sprocket when the mower went backwards."

We regard Querner v. De Spain, 339 S.W.2d 723 (Tex.Civ.App., San Antonio, writ ref. n. r. e.), as being in point. In that case objection was made to an issue as too global and all-embracing because it inquired about a defective air line on a truck. The court observed that if the trial court had "inquired whether the truck was defective instead of the air-line on the truck, the cited case [Roosth & Genecov Production Co. v. White, 152 Tex. 619, 262 S.W.2d 99] would be helpful. Here the specific item was named which plaintiff claimed was defective, and the issue was not too broad." 339 S.W.2d 723, 727, col. 1.

In this case the specific complaint against Gilson Bros. as pleaded by appellees was directed to the exposed power mechanism at the rear of the mower. The charge was that the drive chain was not adequately guarded. The evidence was confined, on this count, to the lack of adequate guard behind the chain and sprocket when the machine was run backwards. The type of adequate guard insisted upon by appellees was limited to the type that would push back or deflect objects with which it came in contact.

The Supreme Court has stated the policy of the law is not to lengthen and complicate special issue charges by submitting various phases or other shades of meaning of an issue already in the charge. Northeast Texas Motor Lines, Inc. v. Hodges, 138 Tex. 280, 158 S.W.2d 487. In that case the Court stated, "It is required only that each controlling issue raised by the pleadings and the evidence be submitted once, fairly, simply and succinctly." 158 S.W.2d 487, 489, col. 1.

We think the issue and definition submitted by the trial court inquiring about an adequate guard for the specific moving parts on the rear axle of the mower meet the test prescribed by the Supreme Court. We overruled the seventh point of error brought up by Gilson Bros.

■ The eighth point of error presented by Gilson Bros. is to the effect that special issue No. 3 and special issue No. 6 constitute a comment on the weight of the evidence because of the difference in the language used in each issue.

The first issue complained of inquired if Kotrla's negligence was a proximate cause of "the collision between the power mower and Mike Thomison." The other issue inquired if the negligence of Gilson Bros. was a proximate cause of "the loss of Mike Thomison's left leg."

We believe the issues were properly phrased and did not constitute a comment on the weight of the evidence.

■ It was the theory of Gilson Bros. that the negligence of Kotrla was the sole proximate cause of "the loss of Michael Thomison's left leg." This theory was submitted in special issue No. 4 in the identical language used in special issue No. 6 as to Gilson Bros.

The theory of appellees was that the conduct of Kotrla resulted in Mike being knocked down, bruised and placed in a position which, but for the negligent design of the mower, would have inflicted no substantial or permanent injury. This theory embraced the further contention that because of the concurrent negligence of Gilson Bros., Mike's leg was pinned to the ground so quickly, and with such force, that it could not be withdrawn or retracted before the mower climbed up his leg. Liability against Kotrla and Joseph was established on proof that Kotrla's negligence was a proximate cause of the collision. The negligence of Gilson Bros. was not a proximate cause of the collision.

At the trial Gilson Bros. sought to obtain two alternative changes in the charges. The first was by request that special issue No.

3 be changed to inquire if Kotrla's negligence was a proximate cause of the "loss of Mike Thomison's left leg." The submission in this form would have required plaintiffs to bear a greater burden of proof than the law requires. It would have placed plaintiffs in the anomalous position of disproving an essential element of their theory of the case, which was that Kotrla's negligence standing alone did not cause the loss of Mike's leg.

If the jury agreed with plaintiffs in their theory, and if the issue had been submitted as requested by Gilson Bros., the jury would have had to answer in the negative to the proximate cause issue as to Kotrla, thereby depriving plaintiffs of the fact findings necessary to support a judgment against Kotrla and Joseph.

█ The second change requested by Gilson Bros. would have caused both special issue No. 3 and No. 6 to inquire if the conduct was a proximate cause of "the occurrence in question."

An inquiry of this general and indefinite nature could have proved baffling to the jury. If the "occurrence in question" referred to the loss of Mike's leg, the dilemma was the same that existed under the first change sought. If this phrase should be taken by the jury to refer to the collision that knocked Mike down, the jury would have had to answer in effect that the negligence of Gilson Bros. was not a proximate cause. With this answer, plaintiffs would have been deprived of fact findings necessary to support a judgment against Gilson Bros.

We conclude that the different wording used by the trial court in special issues Nos. 3 and 6 was essential if the contentions of all parties were to be submitted to the jury. As phrased, the issues did not constitute a comment on the weight of the evidence.

The eighth point of error interposed by Gilson Bros. is overruled.

The judgment of the district court is in all things affirmed.

Affirmed.

## DISSENTING OPINION

HUGHES, Justice.

Being convinced that both in equity and in law, Mr. Joseph is entitled to indemnity or judgment over against Gilson Bros. I, in this respect only, respectfully dissent from the majority opinion.

The portion of such opinion with which I disagree is the following:

"Joseph insists that Gilson Bros. owed Joseph the same duty owed the general public to guard adequately the chain and sprocket on the rear exle of the power mower and therefore Joseph is entitled to indemnity. We believe this duty does not meet the test of Austin Road Co. v. Pope, supra. We fail to see in this record a breach by Gilson Bros. of any duty owing by it to Joseph except the general duty owed Mike Thomison and all others lawfully in vicinity of the power mower while it was being operated. It appears to us that both Joseph and Gilson Bros. owed a duty to exercise a care, one in the operation and the other in the design, of the power mower for the safety of Mike Thomison and all others in the vicinity of the machine while it was being used as it was designed and intended to be used. Both Joseph and Gilson Bros. breached their duty, and each was guilty of the same quality of negligence toward Mike."

In my opinion, Gilson owed Joseph the duty of designing a safe lawn mower which the employee of Joseph might safely use in mowing grass. In other words, Gilson had an affirmative duty to this employee as being in a class who might be reasonably expected to use this mower. Strakos v. Gehring, 360 S.W.2d 787, Tex.Sup.Ct., 1962. This duty inures to the benefit of Joseph because Joseph stands in the shoes

of his employee insofar as liability for his negligent acts committed wihin the scope of his employment is concerned.

If Gilson owed this duty to Joseph, he breached it.

Joseph owed no duty to Gilson which he breached. He is not charged with knowingly or carelessly employing a reckless employee. Joseph did owe a duty, imposed by law, to the injured boy that his employee would not in the course of his employment negligently injure him. This duty, or the liability created by a breach of it, has been given various names. It has been called a vicarious liability, constructive liability, derivative liability or has been given other similar connotations.

It is liability without personal fault and due solely to the relationship existing between the parties, i. e. master and servant.

Joseph did nothing wrong. He, personally, has committed no negligent act. He did not buy the mower or furnish it to his employee. He did not personally supervise its operation.

On the other hand, Gilson, not its employees, committed the wrongful act of designing and placing upon the market an unsafe mower. While, of course, a corporation can only act through its officers and agents there is a distinction between a corporate act and the mere act of an employee. Corporate liability for the negligent acts of its employees rests upon the doctrine of respondeat superior. The liability of the master for the negligent acts of his vice principal is placed upon very different grounds, namely, that the negligent acts of the vice principal are the very acts of the corporation itself. A vice principal, is, among others, any agent of the corporation engaged in the performance, nondelegable or absolute duties of the master. Fort Worth Elevators v. Russell, 123 Tex. 128, 70 S.W.2d 397.

The designing of the mower and the decision to market it were corporate acts and were nondelegable absolute duties of the master, Gilson Bros.

The result of this reasoning, if sound, is that Joseph having personally committed no wrong and whose liability is vicarious or constructive only should have indemnity against Gilson Bros. who, corporately, did perpetrate a wrongful act.

The trial court and the majority opinion recognize the validity of the principle involved when they grant Joseph indemnity against his employee.[1] There are many other instances in which this same principle is applied. See Contribution, Sec. 39, 18 Am.Jur.2d, where many cases are cited to support the text that, "The party whose liability is constructive or derivative merely, who has been forced to respond in damages, may obtain redress against the actual wrongdoer." By "redress" is meant indemnity. Among the cases there cited are Kampmann v. Rothwell, 101 Tex. 535, 109 S.W. 1089 and Westheimer Transfer and Storage Co. v. Houston Bldg. Co., 198 S.W.2d 465, Tex.Civ.App., Galveston, writ ref. n. r. e. (1946).

In Rothwell it was held that an owner was entitled to judgment over against an an independent contractor who committed a negligent act on his property causing injury to a third person.

In Westheimer the Court approved this statement of the law, "where one party (Kotrla) commits a tort, and another party (Joseph) is liable to the person injured by virtue of a rule of law, indemnity is allowed" to the latter.

---

1. The majority says, "We believe that the negligence of Joseph, although constructive, but one upon which the injured party may recover, places Joseph in pari delicto with Gilson Bros." The significance of this statement is obscure. Of course, if the constructive negligence of Joseph did not render him liable to Mike, there would be no judgment against him and no question of indemnity presented.

Cities which have a duty to maintain their streets in good repair are entitled to indemnity against those who caused the condition resulting in injury to third persons. City of San Antonio v. Talerico, 98 Tex. 151, 81 S.W. 518.

Similarly as to the liability of a city for the existence of a nuisance, it is entitled to judgment over against the ones who created the nuisance. City of San Antonio v. Smith, 94 Tex. 266, 59 S.W. 1109.

In Strakos, supra, the Court clearly recognizes the principle I believe applicable here when it said:

"These cases illustrate three approaches used to establish a common-law right of indemnity. One involves the concept of 'different qualities' of negligence; another involves a breach of duty as between tortfeasors; the third gives indemnity to the tortfeasor who is only vicariously liable by operation of law."

Finally, there is the case of Otis Elevator Company v. Cameron, 205 S.W. 852, 857, Tex.Civ.App., Dallas, writ ref., heavily relied upon by Joseph but only mentioned, not discussed, by the majority.

In that case the Court allowed indemnity in favor of an employer whose employee was killed in an elevator accident against the manufacturer of the elevator which was defective even though the employer and the deceased employee were both found to be guilty of negligence. The negligence of the employer was in failing to inspect the elevator and in not furnishing his employee a safe place for work.

In its opinion, the Court cited some of the cases cited herein. It also cited a Massachusetts case, its observations concerning which, I quote:

"The case of Boston Woven Hose & Rubber Co. v. Kendall, 178 Mass. 232, 59 N.E. 657, 51 L.R.A. 781, 86 Am.St.Rep. 478, decided by the Supreme Judicial Court of Massachusetts, Chief Justice Holmes writing the opinion, seems to be directly in point. That was an action to recover damages which the plaintiff had to pay to its employés for personal injuries caused by an explosion of a boiler made by the defendants. The defendants, who were first-class boilermakers, undertook to make for the plaintiff a boiler which would stand a pressure of 100 pounds, and understood that the boiler was to be used to contain naphtha vapor for experiments, in de-vulcanizing india rubber. An experiment was tried, and at a pressure of less than 100 pounds, the naphtha vapor blew out the packing between the door and the end of the boiler by the side of the hinge, escaped into the air, ignited, and caused the damage for which the plaintiff had to pay. The court held that, the plaintiff's misconduct in failing to discover by inspection the defect in the boiler having rendered him liable for damages for the injuries received by his employés, he was entitled to recover over against the defendant, the party who made and furnished the defective boiler. In discussing the case the court said, among other things:

'If indemnity ever is to be recovered, short of an express contract of insurance, for what is in form the result of a tort on the plaintiff's part, this case belongs to that class in which it should be allowed.' "

The feeling expressed by Justice Holmes is felt by me here. Indemnity should be allowed Joseph who personally committed no actionable wrong. His liability is due solely to his relationship with Kotrla, a vicarious, constructive liability. The wrong committed by Gilson Bros. was in the performance of a corporate action and not committed through the negligence of its employees.

If there is no precedent for this ruling, now is the time to establish one.