Margaret Jane **DYSON**, Plaintiff
v.
**GENERAL MOTORS CORPORATION**, Defendant
and
Thalia K. **STEPHENSON**, Third-Party Defendant.

No. 43060.

United States District Court
E. D. Pennsylvania.

April 17, 1969.

Elwood S. Levy, Philadelphia, Pa., for plaintiff.

W. Bradley Ward, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendant.

## OPINION

FULLAM, District Judge.

This is a products-liability case. Plaintiff was severely injured when the automobile in which she was a passenger left the roadway and upset. The right side of the roof collapsed, allegedly as a result of defective design of the vehicle, a 1965 Buick "Electra" two-door hardtop. Plaintiff concedes that the alleged defective design of the roof did not cause the accident, but contends that the severity of her injuries was greatly increased by the failure of the roof to support, even partially, the weight of the overturned car.

The case is presently before the Court on defendant's motion for judgment on the pleadings under Fed.R.Civ. P. 12(c). Accordingly, the issue is whether the pleaded facts, viewed in a

light most favorable to the plaintiff, provide any conceivable basis for permitting plaintiff to recover. *See* Melo-Sonics Corp. v. Cropp, 342 F.2d 856 (3rd Cir. 1965); 2 Moore, Federal Practice § 1215.

Plaintiff has pleaded the following theories of liability: (1) negligence in design and manufacture; (2) breach of express and implied warranties of fitness; (3) strict liability under section 402A of the Restatement of Torts 2d; and (4) conscious or negligent misrepresentation. It is also claimed that plaintiff is entitled to punitive damages. Since the oral argument of the present motion, it has been stipulated that plaintiff makes no claim of defective manufacture of the particular vehicle, but relies solely upon the asserted design defect.

**I**

■ The warranty phase of plaintiff's argument may quickly be disposed of: The plaintiff was not the purchaser and may not obtain the benefit of any warranties extended to the purchaser. Pennsylvania has not abandoned the requirement of horizontal privity. Hochgertel v. Canada Dry Corp., 409 Pa. 610, 187 A.2d 575 (1963) still represents Pennsylvania law on this point; only vertical privity has been eliminated. Kassab v. Central Soya, 432 Pa. 217, 246 A.2d 848 (1968); 12A Pa.Stat.Ann. § 2–318 (1967 supplement).

■ The claim of misrepresentation likewise requires only brief mention. It

is alleged that the defendant's advertising of its 1965 Buick automobiles misrepresented their safety qualities, and that these representations were consciously, or at least negligently, made. In the absence of specific averments, it is somewhat difficult to assume that the advertising amounted to a representation, and was untrue; but even assuming these factors to be present, there would be no basis for recovery unless either the purchaser or the plaintiff relied thereon:

"The causal connection between the wrongful conduct and the resulting damage, essential throughout the law of torts, takes in cases of misrepresentation the form of inducement of the plaintiff to act, or refrain from acting, to his detriment. The false representation must have played a material and substantial part in leading the plaintiff to adopt his particular course; and when he is unaware of it at the time he acted, or it is clear that he was not in any way influenced by it, and would have done the same thing without it for other reasons, his loss is not attributed to the defendant." Prosser, The Law of Torts § 103, at 729 (3rd ed. 1964).

There is no merit to plaintiff's argument that sections 310[1] and 311[2] of the Restatement of Torts 2d authorized recovery notwithstanding lack of reliance.

---

1. Conscious Misrepresentation Involving Risk of Physical Harm
An actor who makes a misrepresentation is subject to liability to another for physical harm which results from an act done by the other or a third person in reliance upon the truth of the representation, if the actor
   (a) intends his statement to induce or should realize that it is likely to induce action by the other, or a third person, which involves an unreasonable risk of physical harm to the other, and
   (b) knows
      (i) that the statement is false, or
      (ii) that he has not the knowledge which he professes.

2. Negligent Misrepresentation Involving Risk of Physical Harm
   (1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results
      (a) to the other, or
      (b) to such third persons as the actor should expect to be put in peril by the action taken.
   (2) Such negligence may consist of failure to exercise reasonable care.
      (a) in ascertaining the accuracy of the information, or
      (b) in the manner in which it is communicated.

*See* Comment (d) under section 310.[3] Robb v. Gylock Co., 384 Pa. 209, 120 A.2d 174 (1956). Moreover, it seems far-fetched to suppose that the present case could be brought within the framework of intentional tort.

## II

In determining the possible liability of the defendant under general negligence principles, and under the strict-liability concepts of section 402A of the Restatement of Torts 2d, the accurate formulation of the issues may differ, but the essence of the issues is identical. In the exercise of due care (or, to avoid creating an "unreasonably dangerous" product) should the defendant have designed the roof of its 1965 Buick Electra hardtop so that it would support the weight of the automobile, when, after a 180° roll-over, the vehicle came to rest on its roof? The answer to this question involves subsidiary lines of inquiry: (1) was the defendant under any legal obligation to provide protection against this kind of hazard (involving, under negligence concepts, such matters as the orbit of risk and foreseeability; and, under section 402A, whether roll-over accidents fall within the contemplated "normal use" of the product) ; and (2) if so, do the pleaded facts establish a breach of such duty.

The defendant understandably relies on the decision of the Seventh Circuit in Evans v. General Motors Corp., 359 F.2d 822 (7th Cir.), cert. denied 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966) and the cases which have followed in its

wake.[4] In *Evans*, Judge Knoch, writing for the majority, stated simply:

"The intended purpose of an automobile does not include its participation in collisions with other objects, despite the manufacturer's ability to foresee the possibility that such collisions may occur. * * * We cannot agree with the plaintiff that the defendant had a duty to equip all its automobiles with side rail perimeter frames * * *. Defendant had a duty to test its frame only to insure that it was reasonably fit for its intended purpose." 359 F.2d at 825.

In Schemel v. General Motors Corp., 384 F.2d 802 (7th Cir. 1967) the same Court held that it was not negligent for a manufacturer to build an automobile capable of going 115 miles per hour, and that the manufacturer was not bound to anticipate "grossly careless misuse of his product by reckless drivers." *Id.* at 805. In Shumard v. General Motors Corp., 270 F. Supp. 311 (S.D.Ohio 1967), it was alleged that plaintiff's decedent was killed as a result of the defective design of a 1962 Corvair, the gas tank of which was so located that, when the vehicle was involved in a collision, the tank ruptured, and the decedent was burned to death. The complaint was dismissed for failure to state a cause of action. Willis v. Chrysler Corp., 264 F.Supp. 1010 (S.D.Tex. 1967) followed the *Evans* rationale where an alleged defective design resulted in a car splitting in two, as a consequence of a head-on collision.[5]

On the other hand, the plaintiff relies upon such cases as Larsen v. General

---

3. "Thus a misrepresentation of the physical condition of a chattel * * * whether by express words or concealment, may make the vendor liable not only to his vendee to whom it is addressed and *who is thereby induced to purchase* it, but also to any person whom the vendee invites or permits to * * * use it." (emphasis added)

It is clear that a non-relying third party may recover only if the original vendor relied. The plaintiff has not pleaded such reliance on the part of the original purchaser of the Buick automobile involved in this section.

4. *Evans* has not been received favorably by the commentators. *See e. g.,* Nader & Page, Automobile Design and the Judicial Process, 55 Cal.L.Rev. 645 (1967) ; Note, Manufacturers' Liability for an Uncrashworthy Automobile, 52 Corn.L.Rev. 444 (1967) ; Note, Liability for Negligent Automobile Design, 52 Iowa L.Rev. 953 (1967) ; 42 Notre Dame Lawyer 111 (1967) ; 80 Harv.L.Rev. 688 (1966) ; 1966 Utah L.Rev. 698.

5. *See also,* General Motors Corp. v. Friend, No. 25054 (Supreme Court of Georgia, March 6, 1969) ; Enders v. Volkswagenwerk, et al., CCH Prod. Liability Rep. § 5930 (Dane County, Wisc.1968).

Motors Corp., 391 F.2d 495 (8th Cir. 1968). In that case, it was alleged that the steering column of the automobile protruded some 2.7 inches forward of the leading surface of the front tires, and that this constituted negligent design because it greatly enhanced the danger to the driver in a collision. The trial court granted summary judgment for the defendant, but the Circuit Court reversed, stating:

> "We think the 'intended use' construction urged by General Motors is much too narrow and unrealistic. Where the manufacturer's negligence in design causes an unreasonable risk to be imposed upon the user of its products, the manufacturer should be liable for the injury caused by its failure to exercise reasonable care in the design. These injuries are readily foreseeable as an incident to the normal and expected use of an automobile. While automobiles are not made for the purpose of colliding with each other, a frequent and inevitable contingency of normal automobile use will result in collisions and injury-producing impacts. No rational basis exists for limiting recovery to situations where the defect in design or manufacture was a causative factor of the accident, as the accident and resulting injury, usually caused by the so-called 'second collision' of the passenger with the interior part of the automobile, are all foreseeable. Where the injuries or enhanced injuries are due to the manufacturer's failure to use reasonable care to avoid subjecting the user of its products to an unreasonable risk of injury, general negligence principles should be applicable. The sole function of an automobile is not just to provide a means of transportation, it is to provide a means of safe transportation or as safe as reasonably possible under the present state of the art." 391 F.2d at 502 (citations omitted)

In essence, the issue is whether the concept of "intended use" includes foreseeable consequences of unintentional misuse.[6] In other contexts, many courts have had no difficulty in rejecting the narrow rationale of *Evans*. *See* Mazzi v. Greenlee Tool Co., 320 F.2d 821 (2nd Cir. 1963). In Spruill v. Boyle-Midway, Inc., 308 F.2d 79 (4th Cir. 1962), involving the death of a small child after swallowing furniture polish manufactured by the defendant, it was held that a cause of action against the manufacturer was stated, even though, admittedly, this was not the intended use of furniture polish. The court stated that a manufacturer:

> " * * * must also be expected to anticipate the environment which is normal for the use of the product and * * * the reasonably foreseeable risks of the use of his product in such an environment." 308 F.2d at 83.

In Ford Motor Co. v. Zahn, 265 F.2d 729 (8th Cir. 1959), recovery was permitted to a plaintiff who, a passenger in the vehicle, was injured on the jagged edge of an ashtray when the driver made a sudden stop. While this case was cited with apparent approval by the *Evans* court as coming within the definition of "intended use" of the automobile and its appurtenances, it would seem that the

---

**6.** One student note has properly identified the issues in a second accident design case:

> "The intended use standard does not in itself dictate the result reached by the court in *Evans*. That standard, even if narrowly construed, should not exempt the manufacturer from responsibility for the faulty performance of his product when consequences occur which he may readily foresee as incident to its normal use * * * There seems to be no rational basis for splitting the event of the collision and allowing recovery only where the condition of the automobile caused the accident; the accident and injury are all part of the same happening in which defendant's failure to use reasonable care caused harm * * *." 80 Harv.L.Rev. 688, 689 (1966).

*See also*, Note, Liability for Negligent Automobile Design, 52 Iowa L.Rev. 953 (1967); Note, Foreseeability in Product Design and Duty to Warn Cases—Distinctions and Misconceptions, 1968 Wisc. L.Rev. 228.

*Evans* rationale would require a different result if the vehicle involved in the *Zahn* case had left the highway before coming to a sudden stop.

Both sides have cited Carpini v. Pittsburgh & Weirton Bus Co., 216 F.2d 404 (3rd Cir. 1954), a case having its origin in a disastrous accident which occurred when the brakes of a heavily overloaded bus failed to function. Recovery against the manufacturer of the bus was upheld, on the basis of negligent design in locating a petcock in the brake hydraulic system too close to the ground, where it was in danger of being damaged by stones and other objects likely to be found on roadways. There was evidence from which the jury could have found that the petcock became damaged and permitted the loss of pressure in the air-brake system of the bus. Plaintiff cites this case for the holding that the misuse of the bus through overloading did not immunize the manufacturer. However, there is no suggestion in the opinion that the overloading of the bus in any way increased the likelihood of damage to the petcock, or contributed to the brake failure. It should also be mentioned that the case was decided on the basis of West Virginia law, although Judge Goodrich's opinion seems to indicate that the result would have been the same under Pennsylvania law, on the basis of familiar Restatement principles. In any event, the decision did not involve a "second accident" situation.[7]

In the present case, counsel have agreed that Pennsylvania law is controlling. Unfortunately, however, neither counsel nor the Court has found any Pennsylvania decision which squarely decides the precise issues involved here.[8] Professor Wright has aptly stated the correct approach which should be adopted by a federal court in this situation:

"In vicariously creating law for a state, the federal court may look to such sources as the restatements of law, treatises and law review commentary, and 'the majority rule.' The federal court must keep in mind, however, that its function is not to choose the rule which it would adopt for itself, if free to do so, but to choose the rule which it believes the state court, from all that is known about its methods of reaching decisions, is likely in the future to adopt." Wright, Law of Federal Courts, 205–06 (1963)

As noted by Judge Kalodner, this may prove to be a "hazardous occupation." Costello v. Schmidlin, et al., 404 F.2d 87, 91 (3rd Cir. 1968).

■ As a general proposition, Pennsylvania has adopted the rule of Palsgraf v. Long Island Ry. Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928) that the scope of the duty is coterminous with the foreseeability of risk. *See e. g.*, Anderson v. Bushong Pontiac Co., 404 Pa. 382, 171 A.2d 771 (1961); Scurfield v. Federal Labs, Inc., 335 Pa. 145, 6 A.2d 559 (1939); Ebbert v. Philadelphia Electric Co., 330 Pa. 257, 198 A. 323 (1938); Dahlstrom v. Schrum, 368 Pa. 423, 84 A.2d 289 (1951). Pennsylvania has long since adopted the rule of section 395 of the Restatement as to the duties of a manufacturer of chattels. Wissman v. General Tire Co., 327 Pa. 215, 192 A. 633 (1937). Section 398 of the Restatement involves similar principles, applied to design negligence. Comment k to section 395 states:

"The manufacturer may, however, reasonably anticipate other uses than the one for which the chattel is primarily intended. The maker of a chair, for example, may reasonably expect that some one will stand on it * * *."

In similar vein, Comment j states:

"Unforeseeable use or manner of use. The liability stated in this section is limited to persons who are endangered and the risks which are created in the course of uses of the chattel which the manufacturer should reasonably anticipate. In the absence of spe-

---

7. See Mickle v. Blackman, 166 S.E.2d 173 (Supreme Court S.C.1969).

8. *See generally*, Products Liability in Pennsylvania, 13 Vill.L.Rev. 793 (1968).

cial reason to expect otherwise, the maker is entitled to assume that his product will be put to a normal use, for which the product is intended or appropriate; and he is not subject to liability when it is safe for all such uses, and harm results only because it is mishandled in a way which he has no reason to expect, or is used in some unusual and unforeseeable manner * * *."

In Smith v. Hobart Mfg. Co., et al., 302 F.2d 570 (3rd Cir. 1962), decided under Pennsylvania law, plaintiff was injured while using a meat grinder from which a safety guard had been removed by his employer. It was held that there was no liability on the part of the manufacturer, since the removal of the protective device constituted "unanticipated misuse of the grinder." A necessary corollary of this holding would seem to be that a manufacturer is liable under Pennsylvania law for failure to provide reasonable protection against foreseeable misuse of the product.

On the other hand, in Adams v. Scheib, 408 Pa. 452, 184 A.2d 700 (1962), the Pennsylvania Supreme Court stated that a seller of pork products was not obliged to foresee that the customer might fail to cook the pork adequately. But see, Catani v. Swift & Co., 251 Pa. 52, 95 A. 931, L.R.A.1917B, 1272 (1915). However, the Adams case was decided under the warranty provisions of the Uniform Commercial Code, and did not involve negligence or section 402A concepts. In Doyle v. South Pittsburgh Water Co., 414 Pa. 199, 199 A.2d 875 (1964), it was held a private citizen whose building was destroyed by fire could maintain an action against a water company for negligent failure to inspect and maintain its water mains and hydrants, allegedly resulting in insufficient water pressure to extinguish the blaze. This decision is distinguishable from the present case, since supplying water for extinguishing fires is an intended use of a water supply system. Nevertheless, the decision is illustrative of a continuing trend toward the broadening of the scope of the duty of care. Contra, Moch Co., Inc. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 896, 62 A.L.R. 1199 (1928).

Pennsylvania has been in the forefront in liberally construing and applying the principles of section 402A of the Restatement. Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966); Kassab v. Central Soya, 432 Pa. 217, 246 A.2d 848 (1968).[9] As noted earlier, section 402A imposes liability upon the manufacturer or seller of a product "in a defective condition unreasonably dangerous to the user or consumer * * *." A product is unreasonably dangerous if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer * * *" (Comment i); [10] "a product is not in a defective condition when it is safe for normal handling and consumption * * * where, however, [the manufacturer] has reason to anticipate that danger may result from a particular use * * * he may be required to give warning of the danger, and a product sold without such warning is in a defective condition." (Comment h). In LaGorga v. Kroger Co., 275 F.Supp. 373 (W.D.Pa. 1967), recovery was permitted against the manufacturer of a child's jacket, which ignited when a spark from a rub-

---

9. In footnote 7 of the opinion, the Court adopted the rule that "economic loss" occasioned by the diminution in the value of the product due to its defective nature, or the product's destruction due to the defect, are proper elements of damage under a section 402A claim. See Note, Products Liability in Pennsylvania, 13 Vill.L.Rev. 793, 847–48 (1968).

10. See Noel, Recent Trends in Manufacturers' Negligence as to Design, Instructions or Warnings, 19 S.W.L.Rev. 43 (1965); Traynor, The Ways and Meanings of Defective Products and Strict Liability, 32 Tenn.L.Rev. 363 (1965); Wade, Strict Tort Liability of Manufacturers, 19 S.W.L.Rev. 5 (1965); see generally, Katz, Liability of Auto Manufacturers for Unsafe Design of Passenger Cars, 69 Harv.L.Rev. 863 (1956); Noel, Manufacturers' Negligence of Design or Direction for Use of a Product, 71 Yale L.J. 816 (1962).

bish fire fell upon it. The Court held that a jury could properly find, on the issue of normal use under Comment h, that the defendant should reasonably have anticipated that exposure to fire might occur during normal wear.

Three significant appellate decisions applying section 402A as Pennsylvania law have been handed down, since the original argument in this case, and the parties have submitted letter briefs on these developments. The defendant places primary reliance on Speyer Inc. v. Humble Oil and Refining Co., 403 F.2d 766 (3rd Cir. 1968). In a footnote in Speyer, the Third Circuit cited Evans v. General Motors, supra. However, the case was cited merely as a contrary authority to the plaintiff's contention in Speyer that a manufacturer has an obligation to manufacture "fail safe" products. Reading the Speyer case as a whole, I am convinced that the Circuit Court was not adopting the holding of Evans, but rather, was only accepting the position that a manufacturer need not make his products "fail safe" or accident proof.

In Bartkewich v. Billinger, 432 Pa. 351, 247 A.2d 603 (1968), the Pennsylvania Supreme Court denied recovery under section 402A for an injury sustained while attempting to remove a piece of glass from a glass-crushing machine. The plaintiff's theory was two-fold: The machine was unreasonably dangerous due to the lack of a safety guard, which would have prevented the plaintiff from inserting his hand into the machine, and due to the lack of an additional safety switch on the side of the machine where the plaintiff was injured. In regard to the plaintiff's first contention, the Supreme Court observed:

"There is no question, of course, that the lack of proper safety devices can constitute a defective design for which there may be recovery under § 402A [citations omitted]. We believe, however, that this rule should only apply to allow recovery where the absence of a safety device caused an accidental injury which was of the type that could

be *expected from the normal use of the product.*" 432 Pa. at 354, 247 A.2d at 605. (emphasis added)

As to the second contention, the Court observed:

"The whole point is that there was no need for appellee (the plaintiff) to be at the spot where the jam (of the glass) occurred to prevent damage to the machine; the switch was easily accessible and would have provided a safe and efficient means of stopping it." 432 Pa. at 355, 247 A.2d at 606.

Whether *Bartkewich* is characterized as an instance in which the plaintiff was barred by his own assumption of risk, or a case in which the product was not unreasonably dangerous, the basis for precluding recovery was that the plaintiff had voluntarily exposed himself to an obvious risk.

"We do not believe that appellant (the defendant) was required to install a guard rail which would prevent a person from *voluntarily putting himself* at so obvious a risk. Appellant was entitled to believe that the machine would be used in its usual manner, and need not be an insurer for the extraordinary risks an operator might choose to take." 432 Pa. at 356, 247 A.2d at 606. (emphasis in original)

Two additional aspects of the *Bartkewich* opinion have particular significance to this case. In rejecting the analysis of the Illinois Court of Appeals in Wright v. Massey-Harris, Inc., 68 Ill.App.2d 70, 215 N.E.2d 465 (1966), a case which the Pennsylvania Supreme Court found to be "legally indistinguishable from the case before [it]," 432 Pa. at 354, 247 A.2d at 605, the Court observed that if the farmer in *Wright* had accidentally come in contact with the moving parts of the cornshucker, there involved, instead of voluntarily putting his hand in proximity to the danger of the moving parts to remove jammed corn ears, the plaintiff in *Wright* would likely have recovered under section 402A, as the Pennsylvania Supreme Court interpreted that section.

Secondly, the *Bartkewich* court went to great pains to make clear that its approval of Messina v. Clark Equipment Co., 263 F.2d 291 (2nd Cir. 1959), a case which reached the same result as *Bartkewich*, did not imply approval of the earlier New York case of Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802 (1950). *Campo* stands for a broader proposition than either *Messina* or *Bartkewich*, in that it holds that liability will not be imposed unless there is a "latent defect", irrespective of whether or not the injury was incurred by accidental or voluntary contact.[11] The importance of *Bartkewich's* disavowal of *Campo* lies in the fact that *Campo* was the case on which the *Evans* court primarily relied.

Greco v. Bucciconi Engineering Co., 407 F.2d 87 (3rd Cir., 1969) was the first case in which our Circuit had an opportunity to consider the impact of *Bartkewich* on Pennsylvania law. There the plaintiff was injured when, due to a design defect, a steel sheet-piler suddenly released a bundle of sheet metal which crushed the plaintiff's hand. There was no question that the plaintiff had voluntarily placed his hand in a position under the piler as it was holding a bundle of sheet metal; however, Judge Staley distinguished *Bartkewich* by stating:

"In the first place, plaintiff in Bartkewich was not injured because of a misoperation of the machine, such as here. Secondly, the court in Bartkewich relieved the manufacturer of liability because the plaintiff assumed an *abnormal, unanticipated* work position when he reached into the machine with knowledge that the danger existed at that time. Here, however, the evidence permits the inference that the manufacturer knew that employees would have to reach under the fingers of the pilers to properly perform their job." (407 F.2d at 921) (emphasis added)

It is interesting to note the relationship between Judge Staley's language, *"abnormal, unanticipated* work position", and the *Bartkewich* language, quoted above, " * * * an accidental injury which was the type that could be *expected* from the normal use of the product." These cases are both consistent with Comments k and j of section 395 of the Restatement, quoted pps. 1069, 1070, *supra,* and Comment k of section 402A, which define intended use to include not only the specific use for which the product was manufactured, but also other anticipated uses.[12]

■ In the light of the foregoing authorities, it is my judgment that a Pennsylvania court would reject the narrow concept of "intended purpose" or "normal use" urged by the defendant in this case, and would not preclude the imposition of liability for the "second accident", i. e., the contact between the passenger and the interior of the vehicle. The correct rule, in my opinion, can be stated either of two ways: (1) vehicular accidents are so commonplace as to constitute a readily foreseeable misuse of motor vehicles; or (2) vehicular accidents are incidental to the normal and intended use of motor ve-

11. Professors Harper and James have also criticized the *Campo* decision:
"[A]nd if it would be feasible for the maker of the product to install a guard or a safety release, it should be a question for the jury whether reasonable care demanded such precaution, though its absence is obvious." 2 Harper & James, The Law of Torts, 1543 (1956).

12. In Olsen v. Royal Metals Corp., 392 F.2d 116 (5th Cir. 1968), the Court considered the issue of intended use:
"Nevertheless, there was evidence that beds of the type in question were used to move patients in such manner not only in Methodist Hospital but at other hospitals and that appellee had knowledge of this use. Appellee's position was that hospitals so using its beds were taking a calculated risk and that it could not prevent such use. We think, in the final analysis, that this presented a question for the jury on the issue of intended use." *Id.* at 119.
*See,* Note, Foreseeability in Product Design and Duty to Warn Cases—Distinctions and Misconceptions, 1968 Wisc.L. Rev. 228; Note, Liability for Negligent Automobile Design, 52 Iowa L.Rev. 954 (1967).

hicles on today's highways. Under this approach to the concept of intended purpose and normal use, the manufacturer would not be held liable for the vicissitudes of using a passenger automobile on a racetrack or a plowed field, for example, but might be held liable for the foreseeable, though accidental, traumatic consequences of the use of passenger cars on highways by occupants.

Having decided that plaintiff's claim is not barred merely because it involves a "second collision" which occurred after the vehicle left the roadway, it now becomes necessary to decide whether there could conceivably be liability for the particular defective condition alleged by the plaintiff. Plaintiff contends that prior to 1965, the defendant did not manufacture a hardtop convertible model of the Buick Electra (one of the largest models of Buick being manufactured); all earlier Electras had full-frame doors, and center posts. In 1965, Buick manufactured the hardtop model of Electra which was involved in this accident. Plaintiff charges that the removal of the center posts, the reduction in the door frame, and the change in angle of the corner roof-supports, so weakened the roof structure that the roof collapsed completely when the vehicle overturned. There is no evidence or allegation as to the speed of the vehicle when it left the roadway, and I must therefore assume, for present purposes, that no greater force was exerted upon the roof than the weight of the vehicle itself, as it came to rest upside-down on a lawn.

■ The defendant insists that the plaintiff is asserting that the defendant owed a duty to manufacture a "crash proof" automobile. Of course, the law does not impose any such obligation. *See* Greco v. Bucciconi Engineering, *supra.* If, for example, a vehicle left the roadway accidentally and came to rest in a river, it could scarcely be argued that the manufacturer should have produced an automobile which would float. Similarly, it could not reasonably be argued that a

car manufacturer should be held liable because its vehicle collapsed when involved in a head-on collision with a large truck, at high speed.

But it is the obligation of an automobile manufacturer to provide more than merely a movable platform capable of transporting passengers from one point to another. The passengers must be provided a reasonably safe container within which to make the journey. The roof is a part of such container, and, except in the case of vehicles, like convertibles, which essentially have no roof in the normal sense of the term, the roof should provide more than merely protection against rain. For example, if the plaintiff's injuries had been sustained because the roof of the vehicle collapsed under the weight of a sack of potatoes which accidentally fell from a passing truck, I am convinced that the defendant could properly be held liable for negligent design and under section 402A.

■ The defendant argues, with considerable plausibility, that any such result would be equivalent to declaring all "soft-top" convertible automobiles unreasonably dangerous *per se*, at least in the absence of roll bars. However, all that is involved is differentiation between various models of automobile, and a recognition of the inherent characteristics of each. The manufacturer cannot be expected to provide a convertible which is as safe in roll-over accidents as a standard four-door sedan with center posts and full-door frames. But the manufacturer can be expected to provide a convertible which is as safe as it reasonably can be made, and which is not appreciably less safe than other convertibles. So, too, in the present case, the manufacturer was not necessarily under an obligation to provide a hardtop model which would be as resistant to roll-over damage as a four-door sedan; but the defendant was required, in my view, to provide a hardtop automobile which was a reasonably safe version of such model, and which was not substantially less safe

than other hardtop models. *See* Traynor, The Ways and Meanings of Defective Products and Strict Liability, 32 Tenn.L.Rev. 363, 370–71 (1965); *See also,* Harper & James, The Law of Torts, 1542 (1956).

██ On the present record, it is conceivable that the plaintiff might be able to show that the design of the vehicle in question does not pass muster under these criteria. Accordingly, irrespective of my views as to the likelihood that plaintiff will be able to meet her burden of proof, it would be inappropriate to grant judgment on the pleadings. Plaintiff should be permitted to pursue discovery in an attempt to establish the cause of action alleged.

██ Similarly, it is too early for a binding determination of the issue of proximate cause, this issue having been expressly disclaimed by defense counsel, most recently in his letter of March 4, 1969, which will be made a part of the record. It is therefore unnecessary to attempt to reconcile such decisions as Barber v. John C. Kohler Co., 428 Pa. 219, 237 A.2d 224 (1968) and Frisch v. Texas Co., 363 Pa. 619, 70 A.2d 290 (1950) with Bleman v. Gold, 431 Pa. 348, 246 A.2d 376 (1968) and Doyle v. South Pittsburgh Water Co., *supra.* It is possible that the plaintiff may be able to produce sufficient evidence to permit a jury to make a valid finding as to the extent of plaintiff's injuries attributable to the defendant's roof design. As noted by the Pennsylvania Supreme Court in its most recent decision the question of proximate causation "is almost always one of fact for the jury." Bleman v. Gold, 431 Pa. at 354, 246 A.2d at 380.

### ORDER

And now, this 17th day of April, 1969, it is ordered that the defendant's motion for judgment on the pleadings under Fed. R.Civ.P. 12(c) is hereby granted, as to Counts 6, 7 and 8 of the complaint, and in all other respects, is hereby denied.